LAW OFFICES OF CAREE HARPER
CAREE HARPER, SBN 219048
  ch1@attorneyharper.com
401 Wilshire Blvd., Suite 1200
Santa Monica, CA  90401
Telephone:  213.386.5078

GIBSON, DUNN & CRUTCHER LLP
KAHN A. SCOLNICK, SBN 228686
  kscolnick@gibsondunn.com
PATRICK J. FUSTER, SBN 326789
  pfuster@gibsondunn.com
THOMAS M. DONOVAN, SBN 354056
  tdonovan@gibsondunn.com
333 South Grand Avenue
Los Angeles, CA  90071-3197
Telephone:  213.229.7000
Facsimile:  213.229.7520

Attorneys for Plaintiff SHANE LOVE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHANE LOVE, | CASE NO. 2:20-cv-06557-PA-SPx |
| Plaintiff, | **PLAINTIFF'S OPENING BRIEF ON REMAND REGARDING MOTION TO DISMISS** |
| v. | **[Fed. R. Civ. P. 12]** |
| CITY OF PASADENA, a municipal entity; PHILLIP SANCHEZ; AARON VILLICANA; THOMAS BUTLER; ROBERT GRIFFITH; MICHAEL OROSCO; PHILLIP POIRIER; RAFAEL SANTIAGO; and DOES 1-10, inclusive, | **<u>Hearing:</u>**<br>Date:        September 8, 2025<br>Time:       1:30 p.m.<br>Place:      Courtroom 9A<br>Judge:     Hon. Percy Anderson |
| Defendants. | |

Gibson, Dunn & Crutcher LLP

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................. 1

BACKGROUND ................................................................................. 2

    A.    Mr. Thomas raises Mr. Love as his son. ........................................... 2

    B.    Pasadena police officers brutally kill Mr. Thomas. ......................... 2

    C.    This Court dismisses Mr. Love's due-process claim. ....................... 4

    D.    The Ninth Circuit remands for further analysis by this Court. ......... 4

ARGUMENT ...................................................................................... 5

    I.    Mr. Love has plausibly alleged the conscience-shocking deprivation of his liberty interest in his relationship with his father. ........ 5

    II.    Mr. Love also has plausibly alleged the deprivation of a fundamental right. .................................................................... 9

        A.    Mr. Love's fundamental right to have his parents direct his upbringing does not depend on how Mr. Thomas became his father. .............................................................................. 10

        B.    The holding-out presumption is deeply rooted in history and tradition in any event. ........................................................ 12

CONCLUSION .................................................................................. 15

PLAINTIFF'S OPENING BRIEF ON REMAND RE MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A.D. v. California Highway Patrol*,
712 F.3d 446 (9th Cir. 2013) ................................................................................. 5, 7

*Backlund v. Barnhart*,
778 F.2d 1386 (9th Cir. 1985) ............................................................................... 8, 9

*Bank of Columbia v. Okely*,
17 U.S. (4 Wheat.) 235 (1819) ................................................................................... 6

*Blythe v. Ayres*,
96 Cal. 532 (1892) ................................................................................................... 13

*Brittain v. Hansen*,
451 F.3d 982 (9th Cir. 2006) ...................................................................................... 8

*Caperton v. A.T. Massey Coal Co.*,
556 U.S. 868 (2009) ................................................................................................... 6

*Castle Rock v. Gonzales*,
545 U.S. 748 (2005) .................................................................................................... 8

*Chavez v. Martinez*,
538 U.S. 760 (2003) .................................................................................................... 6

*County of Sacramento v. Lewis*,
523 U.S. 833 (1998) ................................................................................................ 5, 6

*Crumpton v. Gates*,
947 F.2d 1418 (9th Cir. 1991) .................................................................................... 6

*Curnow v. Ridgecrest Police*,
952 F.2d 321 (9th Cir. 1991) ...................................................................................... 5

*De Sylva v. Ballentine*,
351 U.S. 570 (1956) ............................................................................................... 8, 13

*Dobbs v. Jackson Women's Health Org.*,
597 U.S. 215 (2022) .................................................................................................. 13

Gibson, Dunn &
Crutcher LLP

ii

1
2

# TABLE OF AUTHORITIES

**Page(s)**

3
4

*Estate of Griswold,*
    25 Cal. 4th 904 (2001) ........................................................................................ 13

5
6

*Estate of Hernandez v. City of Los Angeles,*
    96 F.4th 1209 (9th Cir. 2024) .............................................................................. 5

7
8

*Estate of Hernandez v. City of Los Angeles,*
    139 F.4th 790 (9th Cir. 2025) .............................................................................. 5

9

*Gutierrez v. Saenz,*
    145 S. Ct. 2258 (2025) ........................................................................................ 8

10
11

*Hayes v. County of San Diego,*
    736 F.3d 1223 (9th Cir. 2013) ......................................................................... 5, 7

12
13

*Hurtado v. California,*
    110 U.S. 516 (1884) ............................................................................................ 6

14
15

*James v. Rowlands,*
    606 F.3d 646 (9th Cir. 2010) .............................................................................. 8

16
17

*Keates v. Koile,*
    883 F.3d 1228 (9th Cir. 2018) .......................................................................... 11

18
19

*Lehr v. Robertson,*
    463 U.S. 248 (1983) ..................................................................................... 11, 13

20
21

*Love v. Villacana,*
    2025 WL 1392134 (9th Cir. May 14, 2025) .................................................... 4, 5

22

*In re Lund's Estate,*
    26 Cal. 2d 472 (1945) ....................................................................................... 14

23
24

*In re Marriage of Stephen and Sharyne B.,*
    124 Cal. App. 3d 524 (1981) ............................................................................ 14

25
26

*Martinez v. City of Oxnard,*
    337 F.3d 1091 (9th Cir. 2003) ............................................................................ 6

27
28

*Matsuda v. City and County of Honolulu,*
    512 F.3d 1148 (9th Cir. 2008) ............................................................................ 6

Gibson, Dunn & Crutcher LLP

iii

1
2

# TABLE OF AUTHORITIES

**Page(s)**

*McIntyre v. Ohio Elections Comm'n,*
    514 U.S. 334 (1995)........................................................................... 15

*Meyer v. Nebraska,*
    262 U.S. 390 (1923)........................................................................... 10

*Michael H. v. Gerald D.,*
    491 U.S. 110 (1989).....................................................11, 13, 14, 15

*Miller v. California,*
    355 F.3d 1172 (9th Cir. 2004) ........................................................ 8, 9

*Moore v. East Cleveland,*
    431 U.S. 494 (1977)........................................................................... 12

*Moreland v. Las Vegas Metropolitan Police Dep't,*
    159 F.3d 365 (9th Cir. 1998) ............................................................. 7

*Murguia v. Landon,*
    61 F.4th 1096 (9th Cir. 2023) ............................................................ 8

*National Rifle Ass'n of America v. Vullo,*
    602 U.S. 175 (2024)............................................................................ 7

*O'Connor v. Donaldson,*
    422 U.S. 563 (1975)............................................................................ 9

*Obergefell v. Hodges,*
    576 U.S. 644 (2015).................................................................... 11, 12

*Pierce v. Society of Sisters,*
    268 U.S. 510 (1925)........................................................................... 10

*Prince v. Massachusetts,*
    321 U.S. 158 (1944)........................................................................... 11

*Regino v. Staley,*
    133 F.4th 951 (9th Cir. 2025) ................................................. 1, 4, 5, 6

*Reno v. Flores,*
    507 U.S. 292 (1993)........................................................................... 11

iv

Gibson, Dunn &
Crutcher LLP

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

*Rochin v. California,*
4
    342 U.S. 165 (1952)...................................................................... 6

5

*Smith v. City of Fontana,*
6
    818 F.2d 1411 (9th Cir. 1987) ................................................ 5, 10

7

*Smith v. Org. of Foster Families for Equality & Reform,*
    431 U.S. 816 (1977).......................................................... 11, 12, 15
8

9

*Stanley v. Illinois,*
    405 U.S. 645 (1972)...................................................................... 11

10

*Troxel v. Granville,*
11
    530 U.S. 57 (2000)........................................................................ 10

12

*United States v. Windsor,*
13
    570 U.S. 744 (2013)...................................................................... 12

14

*Vernoff v. Astrue,*
15
    568 F.3d 1102 (9th Cir. 2006) ...................................................... 8

16

*Washington v. Glucksberg,*
17
    521 U.S. 702 (1997)........................................................ 4, 5, 10, 13

18

**Constitutional Provisions**

19

U.S. Const. Amend. XIV, § 1, cl. 3 ...................................................... 5

20

**Statutes**

21

42 U.S.C. § 1983 ............................................................................... 1, 4

22

23

1850 Cal. Stat. ch. 96, § 2 at 220 ....................................................... 13

24

1852 Ind. Acts ch. 46, § IX at 293 ..................................................... 14

25

1857 Me. Laws ch. 75, § 3 at 456 ...................................................... 14

26

1863 Idaho Sess. Laws ch. 2, § 316 at 389–90 ................................. 14

27

1867 Minn. Laws ch. 46, § 2 at 354 .................................................. 14

28

PLAINTIFF'S OPENING BRIEF ON REMAND RE MOTION TO DISMISS

1

# TABLE OF AUTHORITIES

2

**Page(s)**

3

1868 Kan. Sess. Laws ch. 33, § 23 at 394 ...................................................................... 14

4

1870 Cal. Stat. ch. 385, § 1 at 530 ................................................................................ 15

5

1870 Cal. Stat. ch. 385, § 9 at 531 .......................................................................... 13, 15

6

7

Cal. Civ. Code § 230 (1872) ......................................................................................... 13

8

Cal. Fam. Code § 3003 ................................................................................................... 8

9

Cal. Fam. Code § 3010 ................................................................................................ 8, 9

10

Cal. Fam. Code § 3010(a) ........................................................................................... 8, 9

11

Cal. Fam. Code § 7540(a) .............................................................................................. 7

12

Cal. Fam. Code § 7571(a) .............................................................................................. 7

13

Cal. Fam. Code § 7601(b) .............................................................................................. 7

14

Cal. Fam. Code § 7611(d) ....................................................................................... 4, 7, 8

15

Cal. Fam. Code § 8616 ................................................................................................... 7

16

Ga. Code Ann. § 1737 (1861) ....................................................................................... 14

17

Howell Code (Ariz. Terr.) ch. 26, § 4 at 183 (1864) .................................................... 14

18

**Other Authorities**

19

Chris Guthrie & Joanna L. Grossman,
   *Adoption in the Progressive Era: Preserving, Creating, and
   Re-Creating Families*, 43 Am. J. Legal Hist. 235 (1999) ........................................ 15

20

21

22

Yasuhide Kawashima,
   *Adoption in Early America*, 20 J. Fam. L. 677 (1981) ............................................ 14

23

24

*Rights of Illegitimate Children Under Modern Statutes*,
   16 Colum. L. Rev. 698 (1916)................................................................................. 14

25

26

27

28

# INTRODUCTION

Reginald Thomas began living with Shane Love at the age of one and raised him as his own child.  To Mr. Love, the public, and the State of California, Mr. Thomas was his father, imbued with all the rights and responsibilities associated with any other parent-child relationship.  But that relationship ended 14 years later when a Pasadena police officer kneeled on Mr. Thomas's neck until he suffocated, as other police officers joined in the beating.  Although children have long been able to bring due-process claims under 42 U.S.C. § 1983 when local governments kill their parents in arbitrary ways, the City of Pasadena argues that such a claim is off limits here because Mr. Thomas had parental rights not through marriage to the mother or adoption, but instead through receiving Mr. Love into his home and holding him out as his son.

The Ninth Circuit remanded for this Court to review Mr. Love's complaint again under its intervening decision in *Regino v. Staley*, 133 F.4th 951 (9th Cir. 2025).  That decision outlines two separate standards for pleading a substantive-due-process claim: the shocks-the-conscience test and the fundamental-rights test.  *Id.* at 960 n.5.  And the claim here satisfies both alternative tests.  First, Mr. Love has a constitutional right to be free from conscience-shocking interference with his parent-child relationship, even though state law governs how Mr. Thomas (like all other fathers) initially gained parental rights and responsibilities.  Second, the fundamental right first recognized by the Supreme Court is parents' right to direct the upbringing of their children.  Precedent makes clear that this right does not depend on how the parents became the children's custodians.  But even if it did, States historically have assigned parental rights based on a man's public acknowledgment of a child as his own.

In short, the City's lone argument for rejecting the due-process claim here—that Mr. Love's interest in being raised on an ongoing basis by Mr. Thomas was too unimportant or unusual to warrant constitutional protection—has no basis in precedent or in this Nation's history and tradition.  This Court should deny the motion to dismiss and allow this long-running case to proceed past the pleadings.

# BACKGROUND

### A.    Mr. Thomas raises Mr. Love as his son.

Mr. Thomas began raising Mr. Love as his son when Mr. Love was just one year old, soon after Mr. Love's biological father died.  FAC ¶¶ 10, 22, Dkt. 33.  Mr. Thomas and Mr. Love's mother, Shainie Lindsey, were partners for 14 years until Mr. Thomas's death and had biological children that they raised along with Mr. Love.  *Id.* ¶¶ 22, 26–27.  For those 14 years, Mr. Thomas referred to Mr. Love as his "son" at home and in public, and Mr. Love in turn called Mr. Thomas "Dad" or "Pops" both in private and in public.  *Id.* ¶ 23.  They shared an apartment except for a 2008–2010 period when Mr. Thomas was in prison and a few weeks in 2016.  *Id.* ¶ 22.  He paid a portion of the rent and financially supported Mr. Love.  *Id.* ¶¶ 24, 28.  He drove Mr. Love to school and doctor's appointments.  *Id.* ¶¶ 26, 28.  He shopped for groceries and cooked Mr. Love's meals.  *Id.* ¶ 25.  He took Mr. Love to the gym and cultivated their shared passion for football.  *Id.* ¶ 27.  He checked in with Mr. Love's football coaches to make sure his grades were up to par.  *Id.* ¶ 23.  He was in the stands, cheering with pride, when Mr. Love scored his first-ever touchdown.  *Id.* ¶ 27.  He taught Mr. Love how to pray.  *Id.* ¶ 29.  And he taught Mr. Love the life lessons that fathers have taught their sons for generations—from how to tie his shoes as a child to how to practice safe sex as a teenager.  *Ibid.*

Their relationship was so indistinguishable from any typical father and son that Mr. Love in fact believed that Mr. Thomas was his biological father under he was 12.  FAC ¶ 23.  And the parent-child relationship was so ingrained that, even after Mr. Love learned that Mr. Thomas was not his biological father, he kept calling him "Dad" anyway, including to his friends, teachers, and other family members.  *Ibid.*  Their father-son relationship wasn't defined by biology, but by the countless hours Mr. Thomas had spent raising Mr. Love.

### B.    Pasadena police officers brutally kill Mr. Thomas.

In the middle of the night on September 30, 2016, Mr. Love woke to his father

experiencing a mental health episode.  FAC ¶ 31.  Mr. Thomas believed his family was in danger, carried a fire extinguisher in his hands and a knife under his arm, and called 911 for help but could not speak coherently with the 911 operator.  *Id.* ¶¶ 31–32.  When Mr. Love spoke with the operator, he explained that Mr. Thomas needed help, added that he had not threatened his family, and gave the operator their address.  *Id.* ¶¶ 33–34.

The 911 operator dispatched six Pasadena police officers.  FAC ¶¶ 30, 35.  When the officers arrived, Mr. Thomas was standing in his doorway with the fire extinguisher and the knife under his arm, but he never threatened or even moved toward the officers. *Id.* ¶ 36.  The officers didn't attempt to deescalate the situation.  Instead, they ordered Mr. Thomas to drop the fire extinguisher and the knife and, without giving him time to comply, began tasing him repeatedly.  *Ibid.*  Mr. Love watched as Mr. Thomas fell back into the apartment and leaned against the door, while the officers held it open from the other side, reached around the door to beat Mr. Thomas with batons, and continued to tase him.  *Id.* ¶ 37.  Even after Mr. Thomas dropped the fire extinguisher and the knife, the officers did not stop the beating.  *Id.* ¶ 38.  They forced their way into the apartment, tackled Mr. Thomas to the floor where he posed no threat, and continued tasing him as he screamed in pain.  *Id.* ¶ 39.  Then, one officer, Aaron Villicana, unleashed a barrage of baton strikes, kicks to the head, and a punch with a "hammer fist" so hard that it broke his own hand.  *Id.* ¶ 40.  Officer Villicana climbed on top of Mr. Thomas, kneeled on his torso, and squeezed the air from his lungs.  *Id.* ¶ 40.  The other officers bound Mr. Thomas's hands and feet, at which point he suddenly went quiet.  *Id.* ¶ 42.  Rather than administer aid, the officers checked Mr. Thomas's waistband.  *Id.* ¶ 43.  They later saw his head dangling lifelessly; for the first time since arriving, they tried to administer aid, but Mr. Thomas was already dead.  *Id.* ¶ 44.

Mr. Love, then only 15 years old, was present for this killing.  FAC ¶ 48.  When he tried to approach Mr. Thomas as the officers were beating him, one of the officers ordered Mr. Love outside the apartment.  *Id.* ¶ 49.  Even from outside, he could hear Mr. Thomas screaming in agony before he went quiet and died.  *Ibid.*  As a result of this

1    experience, Mr. Love has suffered physical and psychological injuries, including severe

2    emotional distress.  *Id.* ¶ 50.

3    **C.    This Court dismisses Mr. Love's due-process claim.**

4        Mr. Love asserts claims under 42 U.S.C. § 1983 against the six responding

5    officers, former Police Chief Sanchez, and the City of Pasadena for depriving him of his

6    Fourteenth Amendment due-process right to companionship and society with his father.

7    FAC ¶¶ 11–18, 74–90.  In its dismissal order, this Court recognized that, "[g]enerally

8    speaking, parents and children have a cognizable liberty interest in the familial

9    companionship of one another that is afforded substantive due process protection under

10   the Fourteenth Amendment." Dkt. 38 at 3.  But the Court reasoned that "not all types of

11   parent-child relationships are entitled to substantive due process protection"—namely,

12   those "relationship[s] lacking a legal or biological connection." *Ibid.*  The Court then

13   spelled out what it meant by a "legal" connection in holding that Mr. Love lacked a

14   protected liberty interest because Mr. Thomas "'was not [his] biological father and never

15   formally adopted him' or took any prospective steps to adopt him." *Id.* at 4.  In this

16   Court's view, Mr. Thomas's status as Mr. Love's legal parent under California Family

17   Code § 7611(d) was insufficient to support a due-process claim. *Id.* at 4–5.

18   **D.    The Ninth Circuit remands for further analysis by this Court.**

19       The Ninth Circuit vacated this Court's dismissal and remanded the case in light

20   of *Regino*. *Love v. Villacana*, 2025 WL 1392134, at *1 (9th Cir. May 14, 2025). *Regino*

21   recognized that "two different legal standards" apply to "substantive due process

22   claims":  "the 'fundamental rights' standard" and "the 'shocks the conscience'

23   standard." 133 F.4th at 960 n.5.  *Regino* also stated that, for a fundamental-rights claim,

24   courts should start with "a 'careful description' of the asserted fundamental liberty

25   interest." *Id.* at 960 (quoting *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)).

26   Courts then ask "whether the asserted interest is 'objectively, deeply rooted in this

27   Nation's history and tradition, and implicit in the concept of ordered liberty.'" *Ibid.*

28   Because this Court "did not undertake such an analysis," the Ninth Circuit remanded for

1  this Court to apply *Regino*.  *Love*, 2025 WL 1392134, at *1.

## ARGUMENT

The Due Process Clause forbids "any State" to "deprive any person of life, liberty, or property, without due process of law."  U.S. Const. Amend. XIV, § 1, cl. 3.  As the Ninth Circuit recognized in *Regino*, "[t]he Supreme Court has applied two different legal standards to substantive due process claims."  133 F.4th at 960 n.5.  The shocks-the-conscience standard requires Mr. Love to allege that the officers ended his parent-child relationship by killing Mr. Thomas in a way that was "'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'"  *Ibid.* (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998)).  Alternatively, the fundamental-rights standard requires Mr. Love to allege a "fundamental liberty interest" that, when "'careful[ly] descri[bed],'" is "objectively, deeply rooted in this Nation's history and tradition."  *Id.* at 960 (quoting *Glucksberg*, 521 U.S. at 720–21).  Mr. Love has alleged a viable due-process claim under both standards, so this Court should deny the City's motion to dismiss for one or both reasons.

## I.  Mr. Love has plausibly alleged the conscience-shocking deprivation of his liberty interest in his relationship with his father.

The Due Process Clause "protect[s] children from unwarranted state interference with their relationships with their parents," including arbitrary killings.  *Smith v. City of Fontana*, 818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*, 199 F.3d 1037, 1040 n.1 (9th Cir. 1999) (en banc).  So as the Ninth Circuit has repeatedly reaffirmed, "a child has a constitutionally protected liberty interest under the Fourteenth Amendment in the 'companionship and society' of [his] father" and thus may challenge the conscience-shocking killing of a parent.  *Hayes v. County of San Diego*, 736 F.3d 1223, 1229–30 (9th Cir. 2013) (quoting *Curnow v. Ridgecrest Police*, 952 F.2d 321, 325 (9th Cir. 1991)); *see, e.g.*, *Estate of Hernandez v. City of Los Angeles*, 96 F.4th 1209, 1221 (9th Cir. 2024), *adopted*, 139 F.4th 790, 804 (9th Cir. 2025) (en banc); *A.D. v. California Highway Patrol*, 712 F.3d 446, 453 (9th Cir. 2013);

1  *Crumpton v. Gates*, 947 F.2d 1418, 1421 (9th Cir. 1991).

2      The right to be free from government action that shocks the conscience is
3  "objectively, deeply rooted in this Nation's history and tradition, and implicit in the
4  concept of ordered liberty, such that neither liberty nor justice would exist if it was
5  sacrificed." *Regino*, 133 F.4th at 960 (brackets and citation omitted).  Shortly after the
6  Fourteenth Amendment's ratification, the Supreme Court reiterated that the "principal
7  and true meaning" of the Due Process Clause prohibits "'the arbitrary exercise of the
8  powers of government.'"  *Hurtado v. California*, 110 U.S. 516, 527 (1884) (quoting
9  *Bank of Columbia v. Okely*, 17 U.S. (4 Wheat.) 235, 244 (1819)).  That arbitrariness
10 standard is satisfied when a claim challenges "executive abuse of power" that "shocks
11 the conscience." *Lewis*, 523 U.S. at 846 (citing *Rochin v. California*, 342 U.S. 165, 172–
12 73 (1952)).  This shocks-the-conscience standard reflects "objective considerations,
13 including history and precedent." *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 887
14 (2009) (quoting *Lewis*, 523 U.S. at 858 (Kennedy, J., concurring)).

15      A plaintiff does not need to prove *both* conscience-shocking conduct *and* the
16 deprivation of a fundamental right.  *Lewis* reserved the question whether and, if so, how
17 the fundamental-rights framework of *Glucksberg* (which concerned a challenge to a
18 statute) applies in "a case challenging executive action." 523 U.S. at 847 n.8.  A majority
19 of Justices later described two independent paths for establishing a substantive-due-
20 process violation:  (1) conscience-shocking deprivations of liberty under *Lewis* and
21 (2) deprivations of fundamental rights under *Glucksberg*. *Chavez v. Martinez*, 538 U.S.
22 760, 774–75 (2003) (plurality); *id.* at 779 (Souter, J., concurring in part in the judgment);
23 *id.* at 787 (Stevens, J., concurring in part and dissenting in part).  On remand in *Martinez*,
24 the Ninth Circuit likewise described the test as disjunctive:  A plaintiff must prove that
25 the government deprived him of liberty or property in a manner "that *either* 'shocks the
26 conscience' *or* interferes with rights 'implicit in the concept of ordered liberty.'"
27 *Martinez v. City of Oxnard*, 337 F.3d 1091, 1092 (9th Cir. 2003) (per curiam) (emphasis
28 added; citations omitted); *see, e.g.*, *Matsuda v. City and County of Honolulu*, 512 F.3d

Gibson, Dunn &
Crutcher LLP

1148, 1156 (9th Cir. 2008).  Said otherwise, people have a fundamental right to be free from conscience-shocking deprivations of their liberty and property interests, regardless of whether the liberty or property interests are *also* fundamental.

Mr. Love has plausibly pleaded a due-process claim under *Lewis*.  The shocks-the-conscience standard governs police killings of parents.  *Moreland v. Las Vegas Metropolitan Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998).  And the complaint's allegations, which "[a]t this stage" must be taken as "true," establish that the officers acted with a purpose to harm, or alternatively had time to deliberate but still brutally beat and suffocated Mr. Thomas to death when he posed no threat to himself or to others. *National Rifle Ass'n of America v. Vullo*, 602 U.S. 175, 195 (2024); *see Hayes*, 736 F.3d at 1230 (explaining the two standards for conscience-shocking conduct, depending on whether deliberation is practical); *see also supra*, at 3.

In moving to dismiss the complaint, the City doesn't even contest that Mr. Love plausibly alleged conscience-shocking conduct and argues only that Mr. Love cannot assert this claim because Mr. Thomas was not his biological or adoptive father.  Dkt. 34 at 4–13.  But the City is wrong.  Mr. Love had the same liberty interest as any other child even though Mr. Thomas gained the status of his father through the holding-out presumption in California Family Code § 7611(d).  There is no free-floating definition of fatherhood that exists separate and apart from state law—not even for a biological father who is married to the mother at conception and at birth.  Every father gets his parental rights through state law one way or another.  *E.g.*, Cal. Fam. Code § 7611(d) (received child into home and held out as own); § 7540(a) (married to and cohabitated with mother of child at conception and birth); § 7571(a) (voluntary declaration of parentage at hospital following birth); § 8616 (adoption).  Because Mr. Thomas had all the "rights, privileges, duties, and obligations" that any other full-blown parent has, § 7601(b), Mr. Love can bring the same challenge to the conscience-shocking killing of his father that "*all* children" could bring, *A.D.*, 712 F.3d at 453 (emphasis added).

There is nothing unusual about looking to state law as the source of liberty

interests.  After all, most substantive entitlements protected by the Due Process Clause are "not created by the Constitution" but instead "stem from an independent source such as state law."  *Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005) (citation omitted); *see Gutierrez v. Saenz*, 145 S. Ct. 2258, 2265 n.1 (2025) (reaffirming that "'[l]iberty,' like property, is protected by the Constitution, 'even when the liberty itself is a statutory creation of the State'").  Courts *typically* look to state law when a federal claim "deals with a familial relationship" because "there is no federal law of domestic relations, which is primarily a matter of state concern."  *De Sylva v. Ballentine*, 351 U.S. 570, 580 (1956).  In fact, the Ninth Circuit has called § 7611—again, the provision at issue here—the "primary means for a father in California to acquire rights as a natural father."  *Vernoff v. Astrue*, 568 F.3d 1102, 1107 (9th Cir. 2006).

The Ninth Circuit has repeatedly allowed plaintiffs to bring substantive-due-process-claims based on state-law custody or visitation rights.  *E.g.*, *James v. Rowlands*, 606 F.3d 646, 651 (9th Cir. 2010).  In *Brittain v. Hansen*, 451 F.3d 982 (9th Cir. 2006), a father had a liberty interest because state law gave him "court-ordered visitation rights" with his son.  *Id.* at 992.  And in *Murguia v. Landon*, 61 F.4th 1096 (9th Cir. 2023), a father had a liberty interest because California law granted him custodial rights over twin children.  *Id.* at 1119 & nn.17–18 (citing Cal. Fam. Code § 3010).  That *same* provision gave Mr. Thomas the right to custody when he received Mr. Love into his home and held him out as his own under § 7611(d):  "The mother . . . and the father, if presumed to be the father under Section 7611, are equally entitled to the custody of the child," § 3010(a), which includes "the right and the responsibility to make the decisions relating to the health, education, and welfare of a child," § 3003.  Here, unlike the plaintiffs in *Brittain* and *Murguia*, Mr. Love also has alleged the permanent termination of that liberty interest in a conscience-shocking fashion, so his claim satisfies every element.  *See supra*, at 7; *cf. Murguia*, 61 F.4th at 1119; *Brittain*, 451 F.3d at 992–97.

In its now-vacated decision, this Court disregarded any role for state family law, citing *Backlund v. Barnhart*, 778 F.2d 1386 (9th Cir. 1985), and *Miller v. California*,

355 F.3d 1172 (9th Cir. 2004). Dkt. 38 at 4. Vacatur deprived that decision of any status as "law of the case" on remand. *O'Connor v. Donaldson*, 422 U.S. 563, 577 n.12 (1975). In line with *James*, *Brittain*, and *Murguia*, this Court should hold that Mr. Thomas's parental rights (including the right to equal custody under § 3010) establish Mr. Love's liberty interest in that relationship—a conclusion that both *Backlund* and *Miller* support. *Backlund* involved a revocation of foster-parent status, after the adults beat the child, that was *consistent* with state officials' state-law "authority to deny or revoke a foster parent's license." 778 F.2d at 1390. As a result, state law did not give the plaintiffs the right either to beat the child or to retain custody. *Id.* at 1389–90. But Mr. Thomas had custody rights by operation of law as a real-deal parent, Cal. Fam. Code § 3010(a), not by the grace of a foster parent's revocable license. *Miller* then made clear that "[a] liberty interest may arise from positive law sources" (that is, state statutes) for "substantive due process," but the plaintiff must establish that state law actually established the liberty interest in question. 355 F.3d at 1176. Here, Mr. Love pleads a viable claim under *Backlund* and *Miller* because he has alleged that Mr. Thomas was his father (not some lesser status like foster parent) under California law, which in turn granted Mr. Thomas custodial and other rights that gave Mr. Love a liberty interest in his continued relationship with Mr. Thomas. Dkt. 35 at 10–14.

In short, Mr. Love has a fundamental right to be free from conscience-shocking interference with his liberty interests. He also has alleged that such conduct deprived him of exactly the kind of "legal relationship" between himself and Mr. Thomas—a legally sanctioned parent-child status—that this Court deemed sufficient in its prior order. Dkt. 38 at 5. The City's motion should be denied.

## II.    Mr. Love also has plausibly alleged the deprivation of a fundamental right.

This Court should deny the City's motion to dismiss for another reason: Mr. Love prevails even under the fundamental-rights standard from *Glucksberg*. Mr. Love's right to be raised by his father is the oldest of the fundamental rights under the Supreme Court's decisions interpreting the Due Process Clause. Parents and children enjoy the

same constitutional rights, however the parent initially obtained his parental status. But even if the Court focuses specifically on the pedigree of the holding-out presumption, that means of forming a parent-child relationship is deeply rooted in history and tradition. California has recognized a holding-out parentage rule since Reconstruction, and public acknowledgment of the child as one's own already was a common basis to assign parental rights by the Fourteenth Amendment's ratification.

### A.    Mr. Love's fundamental right to have his parents direct his upbringing does not depend on how Mr. Thomas became his father.

Mr. Love had a fundamental right to be raised by Mr. Thomas as his parent. The "oldest of the fundamental liberty interests" is the parental interest in the "care, custody, and control of their children." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality); *id.* at 77 (Souter, J., concurring in the judgment). In *Meyer v. Nebraska*, 262 U.S. 390 (1923), the Supreme Court held that the Due Process Clause guarantees parents' right to "establish a home and bring up children." *Id.* at 399. That right includes the ability "to direct the upbringing and education of children under their control" and applies to "those who nurture [children] and direct [their] destiny." *Pierce v. Society of Sisters*, 268 U.S. 510, 534–35 (1925). Although the plaintiffs in both *Meyer* and *Pierce* were parents, this liberty interest is a two-way street: To the same extent that parents have a fundamental right to direct the upbringing of their children, children have a "reciprocal" fundamental right to be raised by their parents. *Smith*, 818 F.2d at 1418.

That fundamental right meets the criteria of *Glucksberg*. Here, the "'careful description' of the asserted fundamental liberty interest" is a child's right to have his father exercise care, custody, and control over his upbringing. 521 U.S. at 721. That interest is "'deeply rooted in this Nation's history and tradition'" and "'implicit in the concept of ordered liberty,' such that 'neither liberty nor justice would exist if they were sacrificed.'" *Id.* at 720–21. We know because the Supreme Court said so: *Glucksberg* itself reaffirmed that the Due Process Clause protects the "fundamental righ[t]" to "direct the education and upbringing of one's children." *Id.* at 720; *see Troxel*, 530 U.S. at 66

(plurality).  And since *Glucksberg*, the Ninth Circuit too has reiterated that the "right to familial association" is a "fundamental liberty interest."  *Keates v. Koile*, 883 F.3d 1228, 1236 (9th Cir. 2018).

To assert the fundamental right to be raised by his parents, Mr. Love does not have to establish that Mr. Thomas acquired parental status in any particular way.  The most traditional means for a father to secure parental rights, of course, is to conceive a child with his wife, thereby triggering the presumption of legitimacy.  *Michael H. v. Gerald D.*, 491 U.S. 110, 124–25 (1989) (plurality).  But the Due Process Clause doesn't deny recognition to "those family relationships unlegitimized by a marriage ceremony."  *Stanley v. Illinois*, 405 U.S. 645, 651 (1972).  Nor does the Due Process Clause require biological parenthood or adoption—merely "a recognized family unit" reflecting a "commitment to the responsibilities of parenthood."  *Lehr v. Robertson*, 463 U.S. 248, 258, 261 (1983).  In *Prince v. Massachusetts*, 321 U.S. 158 (1944), for example, the plaintiff there was not a biological or adoptive parent, but instead an aunt who was acting as her niece's guardian.  *Id.* at 159, 167.  But even though the State had appointed the aunt as guardian, she could still assert due-process rights under *Meyer* and *Pierce*.  *Id.* at 166; *see Reno v. Flores*, 507 U.S. 292, 310 (1993) ("legal guardianship" is granted "by the States").  *Prince* thus establishes that the right to raise one's children "extends beyond natural parents" to "legal custodian[s]."  *Smith v. Org. of Foster Families for Equality & Reform*, 431 U.S. 816, 843 n.49 (1977) (*OFFER*).  Mr. Love's claim falls squarely within *Prince* and *OFFER* because Mr. Thomas was his legal custodian through the holding-out presumption of parental status.  *Supra*, at 7–8.

The City asks this Court to pick and choose among parent-child relationships, welcoming in a favored subset (marital presumption and adoption) while stripping due-process protections from those that received state-law recognition through the holding-out presumption.  In *Obergefell v. Hodges*, 576 U.S. 644 (2015), the Supreme Court declined to apply *Glucksberg* in a way that would subdivide the long-recognized right to marriage according to the specific configurations of the spouses (there, opposite

versus same sex). *Id.* at 671. The right to marry instead should be defined "in its comprehensive sense, asking if there [is] a sufficient justification for excluding the relevant class from the right," because *Glucksberg* doesn't limit fundamental rights based on "*who* exercised them in the past." *Ibid.* (emphasis added). That logic applies equally to the fundamental right to be raised by one's parents, however they became legal custodians. *Id.* at 667–68. Because "[a]ppropriate limits on substantive due process come not from drawing arbitrary lines but rather from careful 'respect for the teachings of history [and] solid recognition of the basic values that underlie our society,'" the Constitution doesn't "cu[t] off any protection of family rights at the first convenient, if arbitrary boundary—the boundary of the nuclear family." *Moore v. East Cleveland*, 431 U.S. 494, 502–03 (1977) (plurality); *accord OFFER*, 431 U.S. at 843–44.

Mr. Love therefore doesn't have to show a fundamental right "to be raised by a father who became one's parent through the holding-out presumption." Rather, the City must identify a "sufficient justification" for excluding children like Mr. Love from the "comprehensive" right to be raised by one's parents. *Obergefell*, 576 U.S. at 671. There is no such justification. All agree "that a deeply loving and interdependent relationship between an adult and a child in his or her care may exist even in the absence of blood relationship." *OFFER*, 431 U.S. at 844. The Due Process Clause also commands respect for how California has "used its historic and essential authority" to define the parent-child relationship and to provide "recognition, dignity, and protection" to family units bound together by the holding-out presumption. *United States v. Windsor*, 570 U.S. 744, 768 (2013). Once Mr. Thomas received Mr. Love into his home and held him out as his own, they shared all the same rights and responsibilities as any other parent and child—just like the guardian (a lesser status than parent) in *Prince*. Mr. Love thus can sue the City for interfering with his fundamental right to be raised by Mr. Thomas.

### B. The holding-out presumption is deeply rooted in history and tradition in any event.

Mr. Love satisfies the *Glucksberg* standard even if this Court focuses on the

particular way that Mr. Thomas secured parental rights. For a fundamental-rights claim, the Supreme Court typically looks to the period before and immediately after the Fourteenth Amendment's ratification in 1868. *See, e.g.*, *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 248–49 (2022); *Glucksberg*, 521 U.S. at 715–16.

California first began assigning parental rights through a holding-out rule in 1870. That early statute provided that either parent of an illegitimate child may legitimate the child, thereby entitling the child to all the "rights and privileges" of legitimate children, by "receiving or acknowledging him publicly as his or their own legitimate child." 1870 Cal. Stat. ch. 385, § 9 at 531. The Civil Code of 1872 used similar language in providing that a man could secure parental rights over an illegitimate child by "publicly acknowledging it as his own" and "receiving it as such." Cal. Civ. Code § 230 (1872). In *Michael H.*, Justice Scalia stressed the identical historical pedigree of the marital presumption that California enacted in 1872. 491 U.S. at 117 (plurality). And the Supreme Court for decades has discussed § 230 and other similar holding-out rules as normal features of state parentage law. *De Sylva*, 351 U.S. at 582; *see, e.g.*, *Lehr*, 463 U.S. at 251. So as the modern successor to § 230, California Family Code § 7611(d) has deep roots that trace to the Reconstruction era—the relevant historical period under *Glucksberg*. *See Estate of Griswold*, 25 Cal. 4th 904, 914 n.4 (2001).

Traditional parentage law also had established that public acknowledgment of a child could create a parent-child relationship, even absent a biological relationship, by the Fourteenth Amendment's ratification. In our first year of statehood, the California legislature provided that "[e]very illegitimate child shall be considered as an heir of the person who shall, in writing, signed in the presence of a competent witness, have acknowledged himself to be the father of such child." 1850 Cal. Stat. ch. 96, § 2 at 220. Both that statute and § 230 required only that a father "acknowledge the relationship of father and [child]" (and, for § 230, receive the child into his home). *Blythe v. Ayres*, 96 Cal. 532, 576, 583 (1892); *see Griswold*, 25 Cal. 4th at 918. Requiring proof of biological paternity would have been a radical departure from traditional parentage law,

which by necessity didn't rely on biology. For example, a "fundamental principle of the common law" was the marital presumption, which could be rebutted only in extreme circumstances—in England, only if the husband was "beyond the four seas" when the baby was conceived. *Michael H.*, 491 U.S. at 124 (plurality). This rule safeguarded the "'peace and tranquility of States and families,'" regardless of whether the husband was the biological father. *Id.* at 125. Plus, making biology the benchmark for paternal rights would be anachronistic because "no competent evidence could be adduced" to show biological paternity at a time when paternity tests did not yet exist. *In re Marriage of Stephen and Sharyne B.*, 124 Cal. App. 3d 524, 528 (1981).

Many other States had recognized that public acknowledgment could create a parent-child relationship by the Fourteenth Amendment's ratification. "'From an early day,'" Americans developed ways by which an illegitimate child's "'status could be changed to th[at] of a lawful child,'" thereby "'placing the child in all respects upon the same footing as if begotten and born in wedlock.'" *In re Lund's Estate*, 26 Cal. 2d 472, 480 (1945). Colonists practiced a form of proto-adoption—public acknowledgment of the child as one's own—in which a parent-child relationship "could exist beyond the blood relationship." Yasuhide Kawashima, *Adoption in Early America*, 20 J. Fam. L. 677, 695 (1981). At least seven States and Territories had joined California by 1868 with statutes providing that the father's public acknowledgement could form a parent-child relationship without any separate proof of biological paternity. 1852 Ind. Acts ch. 46, § IX at 293; 1857 Me. Laws ch. 75, § 3 at 456; Ga. Code Ann. § 1737 (1861); 1863 Idaho Sess. Laws ch. 2, § 316 at 389–90; Howell Code (Ariz. Terr.) ch. 26, § 4 at 183 (1864); 1867 Minn. Laws ch. 46, § 2 at 354; 1868 Kan. Sess. Laws ch. 33, § 23 at 394. And by the early 20th century, "most American jurisdictions" had statutes facilitating legitimation and inheritance of children born out of wedlock, including through public acknowledgment. *Rights of Illegitimate Children Under Modern Statutes*, 16 Colum. L. Rev. 698, 698–99 & nn.4–5 (1916). The "long, accepted usage" of public acknowledgement as an appropriate basis to assign parental rights deserves

respect as a "widespread and long-accepted practic[e] of the American people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 375–78 (1995) (Scalia, J., dissenting) (so describing a legislative trend that didn't even begin until 1890).

Any argument that the holding-out presumption is not deeply rooted under *Glucksberg* would also prove far too much. The City has conceded that a child could bring a claim under the Due Process Clause for the killing of an adoptive parent. Dkt. 34 at 5. But "[a]doption was unknown at common law." Chris Guthrie & Joanna L. Grossman, *Adoption in the Progressive Era: Preserving, Creating, and Re-Creating Families*, 43 Am. J. Legal Hist. 235, 236 (1999). California first created a formal adoption mechanism in 1870—two decades after its public-acknowledgment probate statute and at the same time as its first holding-out rule, which California treated as a subset of adoption. *Id.* at 237; *see* 1870 Cal. Stat. ch. 385, §§ 1, 9 at 530–31. If adoption is "the legal equivalent of biological parenthood," *OFFER*, 431 U.S. at 844 n.51, there is no reason why even older public-acknowledgment statutes would fall short. The City also concedes that biological paternity can support a claim even when the parents were not married. Dkt. 34 at 5. Again, though, mere biological paternity couldn't be tested at the Fourteenth Amendment's ratification and has never rivaled the "historic respect" owed to "relationships that develop within the unitary family," including "the household of unmarried parents and their children." *Michael H.*, 491 U.S. at 123 & n.3 (plurality).

The holding-out presumption, like other forms of public acknowledgment, is deeply rooted in history and implicit in the concept of ordered liberty. The family unit is the cornerstone of both individual liberty and civilization—today, as in 1868, as it always has been. And there is nothing unusual or ahistorical about California's decision to recognize already-existing family units through the holding-out presumption. That leaves the City no basis in history or precedent to relegate Mr. Love and Mr. Thomas's parent-child relationship to second-class status under the Due Process Clause.

## CONCLUSION

This Court should deny the motion to dismiss.

Gibson, Dunn & Crutcher LLP

PLAINTIFF'S OPENING BRIEF ON REMAND RE MOTION TO DISMISS

Dated:  July 28, 2025                    Respectfully submitted,


                                         LAW OFFICES OF CAREE HARPER


                                         By: _____*/s/ Caree Harper*_____
                                                          Caree Harper



                                         GIBSON, DUNN & CRUTCHER LLP


                                         By: _____*/s/ Patrick J. Fuster*_____
                                                          Patrick J. Fuster

                                         Attorneys for Plaintiff SHANE LOVE

PLAINTIFF'S OPENING BRIEF ON REMAND RE MOTION TO DISMISS

1

## **ECF ATTESTATION**

2

   The undersigned hereby attests under Local Rule 5-4.3.4(a)(2) that the

3

concurrence in the filing of this document has been obtained from the above signatories.

4

5

Dated: July 28, 2025

6

7

8

   By: _____*/s/ Patrick J. Fuster*_____

9

   Patrick J. Fuster

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

17

PLAINTIFF'S OPENING BRIEF ON REMAND RE MOTION TO DISMISS