1  **STEVEN J. ROTHANS – State Bar No. 106579**
   **JILL WILLIAMS – State Bar No. 221793**
2  **SCOTT CARPENTER – State Bar No. 253339**
   **CARPENTER, ROTHANS & DUMONT LLP**
3  **500 South Grand Avenue, 19th Floor**
   **Los Angeles, California 90071**
4  **(213) 228-0400 / (213) 228-0401 (Fax)**
   **jwilliams@crdlaw.com | scarpenter@crdlaw.com**
5
6  **MICHELE BEAL BAGNERIS, City Attorney**
   **State Bar No. 115423**
7  **ARNOLD F. LEE, Assistant City Attorney**
   **State Bar No. 278610**
8  **100 N. Garfield Avenue, Suite N-210**
   **Pasadena, CA 91109**
9  **(626) 744-4141 / (626) 744-4190 (Fax)**
   **mbagneris@cityofpasadena.net | aflee@cityofpasadena.net**

10  Attorneys for Defendants, City of Pasadena,
    Chief Phillip Sanchez and Officers Aaron Villacana,
11  Thomas Butler, Robert Griffith, Michael Orosco,
    Phillip Poirier, and Raphael Santiago

12

13                  **UNITED STATES DISTRICT COURT**

14                 **CENTRAL DISTRICT OF CALIFORNIA**

15

16  SHANE LOVE,                         )  Case No.:  2:20-cv-06557-PA-SPx
                                        )
17                                      )  **DEFENDANTS' SUPPLEMENTAL**
              Plaintiff,                )  **BRIEF IN SUPPORT OF THEIR**
18       vs.                            )  **MOTION TO DISMISS**
                                        )  **PLAINTIFF'S FIRST AMENDED**
19  CITY OF PASADENA, a municipal       )  **COMPLAINT; MEMORANDUM**
    entity; PHILLIP SANCHEZ; AARON      )  **OF POINTS AND AUTHORITIES**
20  VILLACANA, THOMAS BUTLER,           )  **IN SUPPORT THEREOF**
    ROBERT GRIFFITH, MICHAEL            )
21  OROSCO, PHILLIP POIRIER,            )  **[Fed. R. Civ. P., 12(b)(6)]**
    RAFAEL SANTIAGO; and DOES 1-10      )
22  inclusive,                          )  DATE:   Sept. 8, 2025
                                        )  TIME:    1:30 p.m.
23                                      )  COURTROOM:  9A
              Defendants.               )
24                                      )
                                        )
25  _____ )

26        COME NOW Defendants, City of Pasadena, Chief Phillip Sanchez and

27  Officers Aaron Villacana, Robert Griffith, Michael Orosco, Thomas Butler, Phillip

28  Poirier, and Raphael Santiago, and, pursuant to this Court's Order (Dkt. No. 47),

                                    - 1 -

1   hereby submit this Supplemental Brief in support of their Motion to Dismiss

2   Plaintiff's First Amended Complaint for Damages (Dkt. No. 34).

3   DATED:  July 28, 2025          CARPENTER, ROTHANS & DUMONT LLP

4                                            */s/ Scott J. Carpenter*

5                                   By:  _____

6                                        STEVEN J. ROTHANS
                                         JILL WILLIAMS
                                         SCOTT J. CARPENTER

7                                        Attorneys for Defendants

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

# **TABLE OF CONTENTS**

I.    INTRODUCTION ...........................................................................1

II.   BACKGROUND & OVERVIEW .................................................1

III.  OVERVIEW OF THE *GLUCKSBERG* ANALYSIS. ..................3

IV.   *GLUCKSBERG* CONFIRMS THAT PLAINTIFF HAS NO
      SUBSTANTIVE DUE PROCESS RIGHT TO COMPANIONSHIP WITH
      RESPECT TO DECEDENT. ..........................................................4

      A.    Step One:  A Careful Description Of The Asserted Fundamental
            Right.4

      B.    Step Two:  The History And Tradition Of Our Nation Do Not
            Establish Plaintiff's Right To Companionship With Decedent. ....................5

            1.    The Common Law Reflects Parental Rights Related To
                  Biological Relationships. ...............................................6

            2.    Case Law Reinforces The Necessity Of Biological Or Legally
                  Established Relationships. ...............................................9

      C.    State Law Does Not Create Substantive Due Process Rights. ...........14

V.    CONCLUSION .............................................................................15

- i -

# TABLE OF AUTHORITIES

**Cases**

Am. C.L. Union of Kentucky v. McCreary Cnty., Kentucky,
354 F.3d 438 (6th Cir. 2003)..................................................................6

Avelar v. Rodriguez, 2018 WL 3636981 (C.D. Cal. June 13, 2018) ....................11

Chavez v. Martinez, 538 U.S. 760 (2003) ...................................................4

Collins v. City of Harker Heights, Tex., 503 U.S. 115 (1992)................................3

Dawn D. v. Superior Ct. (Jerry K.), 17 Cal. 4th 932 (1998) ...............................4

Dep't of State v. Munoz, 602 U.S. 899 (2024) ...........................................3, 5

Dobbs v. Jackson Women's Health Org., 597 U.S. 215 (2022)...........................3, 6

Est. of Hernandez by & through Hernandez v. City of Los Angeles,
139 F.4th 790 (9th Cir. 2025) ...........................................................8, 13

Hodes & Nauser, MDs, P.A. v. Schmidt, 309 Kan. 610 (2019) ..............................7

Huk v. Cnty. of Santa Barbara, 650 F. App'x 365 (9th Cir. 2016) .........................10

Khachatryan v. Blinken, 4 F.4th 841 (9th Cir. 2021).................................3, 4, 6

Kitaj v. Van Handel, 2024 WL 4026206 (D. Ariz. Sept. 3, 2024).........................11

LeFever v. Ferguson, 645 F. App'x 438 (6th Cir. 2016) .......................................13

Lehr v. Robertson, 463 U.S. 248 (1983) ....................................................10

Lofton v. Sec'y of Dep't of Child. & Fam. Servs.,
358 F.3d 804 (11th Cir. 2004) ..............................................................10

Love v. Villacana, 2020 WL 5815920 (C.D. Cal. Aug. 27, 2020............................1

Love v. Villacana, 2020 WL 5815920 (C.D. Cal. Aug. 27, 2020) ..........................1

Love v. Villacana, 2025 WL 1392134 (9th Cir. May 14, 2025)............................2

Love v. Villacana, 73 F.4th 751 (9th Cir. 2023) .............................................2

McCurdy v. Dodd, 352 F.3d 820 (3d Cir. 2003)...........................................13

McDonald v. City of Chicago, 561 U.S. 742 (2010)..........................................7

Members of Med. Licensing Bd. of Indiana v. Planned Parenthood Great Nw.,
Hawai'i, Alaska, Indiana, Kentucky, Inc., 211 N.E.3d 957 (Ind. 2003) ...............7

Meyer v. Nebraska, 262 U.S. 390 (1923)...................................................10

- i -

TABLE OF AUTHORITIES

<u>Michael H. v. Gerald D.</u>, 491 U.S. 110 (1989)............................................11, 12, 14

<u>Moore v. City of E. Cleveland, Ohio</u>, 431 U.S. 494 (1977).....................................14

<u>Pierce v. Soc'y of Sisters</u>, 268 U.S. 510 (1925)....................................................10

<u>Prince v. Massachusetts</u>, 321 U.S. 158 (1944).....................................................11

<u>Regino v. Staley</u>, 133 F.4th 951 (9th Cir. 2025) ..........................................passim

<u>Reno v. Flores</u>, 507 U.S. 292 (1993).............................................................5, 13

<u>Robertson v. Hecksel</u>, 420 F.3d 1254 (11th Cir. 2005).........................................13

<u>Santosky v. Kramer</u>, 455 U.S. 745 (1982) ...........................................................9

<u>Shaw v. Stroud</u>, 13 F.3d 791 (4th Cir. 1994) .....................................................13

<u>Smith v. City of Fontana</u>, 818 F.2d 1411 (9th Cir. 1987) ................................4, 13

<u>Smith v. Org. of Foster Fams. For Equal. & Reform</u>, 431 U.S. 816 (1977).......9, 11

<u>Stanley v. Illinois</u>, 405 U.S. 645 (1972) ...............................................................9

<u>Timbs v. Indiana</u>, 586 U.S. 146 (2019) ................................................................6

<u>Troxel v. Granville</u>, 530 U.S. 57 (2000)..............................................................12

<u>Valdivieso Ortiz v. Burgos</u>, 807 F.2d 6 (1st Cir. 1986) .......................................13

<u>Washington v. Glucksberg</u>, 521 U.S. 702 (1997) ..........................................passim

<u>Wheeler v. City of Santa Clara</u>, 894 F.3d 1046 (9th Cir. 2018) ..........................10

**Statutes**

42 U.S.C. § 1983................................................................................................1

**Other Authorities**

1 W. Blackstone, <u>Commentaries</u> .........................................................................7, 9

2 J. Kent, <u>Commentaries on American Law</u>........................................................8, 9

J. Locke, Second Treatise of Civil Government (J. Bennett ed. 2008)...................7

Mary Ann Mason, <u>From Father's Property to Children's Rights: The History of Child Custody in the United States</u> (1994) .........................................................8, 9

TABLE OF AUTHORITIES

1    **MEMORANDUM OF POINTS AND AUTHORITIES**

2    **I.    INTRODUCTION**

3    The question before the Court is this:  Does a 15-year-old have a

4    fundamental substantive due process right to companionship with an alleged

5    father-figure with whom he had no biological, adoptive, or legal relationship?  A

6    review of Supreme Court precedent and the "history and traditions" of our Nation

7    show that no such right exists.  This Court should reaffirm its dismissal of

8    plaintiff's action.

9    **II.    BACKGROUND & OVERVIEW**[1]

10    This lawsuit relates to a September 30, 2016 use-of-force incident involving

11    Pasadena police officers and decedent Reginald Thomas.  In his First Amended

12    Complaint ("FAC"), plaintiff, Shane Love, claims he "was a child who lived with

13    Reginald Thomas at the time of his killing," and he brings a substantive due

14    process claim related to Thomas's death under 42 U.S.C. § 1983 and the

15    Fourteenth Amendment.  FAC ¶¶ 10-11.  However, "Plaintiff concedes that

16    Thomas was not [his] biological father and never formally adopted him or took

17    any prospective steps to adopt him."  Nov. 27, 2023 Order, Dkt. No. 38 at 4.

18    This action is the third lawsuit that has been brought related to the death of

19    Reginald Thomas and is the second action filed by Mr. Love.  Plaintiff's first suit

20    (the "*Terry Action*") was dismissed with prejudice by U.S. District Judge S. James

21    Otero for lack of standing.  Plaintiff then filed a second suit in state court, which

22    defendants removed to this Court, and moved to dismiss based on res judicata.

23    After this Court entered dismissal (Love v. Villacana, 2020 WL 5815920, at *5

24    (C.D. Cal. Aug. 27, 2020)), the Ninth Circuit vacated the dismissal on the grounds

25    

26    ───────────────────

[1] Defendants provide a brief overview of this action, but otherwise defendants

27    presume the Court's familiarity with the case.  For efficiency, the factual and
procedural summaries set forth in defendants' Motion to Dismiss (Dkt. No. 34)

28    are reincorporated herein.

- 1 -

1    that Judge Otero's ruling was merely jurisdictional, and it remanded for this Court
2    to determine whether Love adequately states a claim.  <u>Love v. Villacana</u>, 73 F.4th
3    751, 756-57 (9th Cir. 2023) ("<u>Love I</u>").

4         After <u>Love I</u>'s remand, defendants filed a Motion to Dismiss (Dkt. No. 34)
5    on the basis that no constitutionally protected relationship existed between
6    plaintiff and decedent in the absence of a biological or legal relationship between
7    the two.  This Court agreed and dismissed the case for a second time.  <u>See</u> Dkt.
8    No. 38 (finding that plaintiff "lacks any biological or legal connection to Thomas
9    and therefore has no protected liberty interest in their relationship").  The Ninth
10   Circuit again vacated the Court's dismissal.  <u>Love v. Villacana</u>, 2025 WL
11   1392134, at *1 (9th Cir. May 14, 2025) ("<u>Love II</u>").

12        Based on its recent decision in <u>Regino v. Staley</u>, 133 F.4th 951 (9th Cir.
13   2025), the Ninth Circuit remanded the case to this Court to apply the two-step
14   analysis required under <u>Washington v. Glucksberg</u>, 521 U.S. 702 (1997) for
15   purposes of "determining whether a right is cognizable to state a substantive due
16   process claim."  <u>Love II</u>, 2025 WL 1392134, at *1.

17        While this Court's prior analysis had uncovered that "neither the Supreme
18   Court nor the Ninth Circuit has found that a relationship lacking a legal or
19   biological connection – like that of Plaintiff and Thomas – is sufficient to support
20   a substantive due process claim for loss of a parent-child relationship" (Dkt. No.
21   38 at 3), <u>Glucksberg</u> requires an analysis of history, customs, and practices to
22   determine whether an asserted right is so "deeply rooted in this Nation's history
23   and tradition" as to be ranked fundamental.  <u>Glucksberg</u>, 521 U.S. 721.

24        As demonstrated below, <u>Glucksberg</u> reinforces that dismissal is again
25   warranted.  Not only is there no Supreme Court or Ninth Circuit precedent
26   supporting plaintiff's claim, no historical practices, traditions, or standards
27   recognize a 15-year-old's right to companionship with a man, to which he had no
28   biological or legal connection.

- 2 -

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

III.    **OVERVIEW OF THE *GLUCKSBERG* ANALYSIS.**

"Constitutional analysis must begin with 'the language of the instrument . . .'" Dobbs v. Jackson Women's Health Org., 597 U.S. 215, 235 (2022) (citations omitted).  Where, as here, the "Constitution makes no express reference to a right," it must be shown that "the right is somehow implicit in the constitutional text." Id.

Identifying unenumerated substantive due process rights "carries a serious risk of judicial overreach." Dep't of State v. Munoz, 602 U.S. 899, 910 (2024); see Regino, 133 F.4th at 960 (recognizing that "substantive due process has sometimes been '*a treacherous field*' that has 'led the Court to usurp authority that the Constitution entrusts to the people's elected representatives'") (emphasis added) (quoting Dobbs, 597 U.S. at 239-40).

"[T]he [Supreme] Court has always been reluctant to expand the concept of substantive due process because guideposts for responsible decision-making in this unchartered area are scarce and open-ended." Collins v. City of Harker Heights, Tex., 503 U.S. 115, 125 (1992).  Courts are warned that they must "'*exercise the utmost care*' before 'breaking new ground' in the area of unenumerated fundamental rights." Regino, 133 F.4th at 960 (emphasis added) (quoting Khachatryan v. Blinken, 4 F.4th 841, 856 (9th Cir. 2021) and Collins, 503 U.S. at 125).  In particular, when interpreting the Fourteenth Amendment's reference to "liberty," courts "must guard against the natural human tendency to confuse what that Amendment protects with [their] own ardent views about the liberty that Americans should enjoy." Dobbs, 597 U.S. at 239.

To identify an unenumerated right, courts are to follow the two-step inquiry set forth in Glucksberg.  First, the inquiry "insists on a '*careful description of the asserted fundamental liberty interest*.'" Regino, 133 F.4th at 960 (emphasis added) (quoting Glucksberg, 521 U.S. at 721).  Second, the inquiry "stresses that 'the Due Process Clause specially protects' only 'those fundamental rights and

- 3 -

liberties which are, ***objectively, deeply rooted in this Nation's history and tradition***." Regino, 133 F.4th at 960 (emphasis added) (quoting Glucksberg, 521 U.S. at 720–21).  A new fundamental due process right may be recognized "only if it is 'objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if [it] were sacrificed.'" Khachatryan, 4 F.4th at 858 (quoting Glucksberg, 521 U.S. at 721).

## IV.  *GLUCKSBERG* CONFIRMS THAT PLAINTIFF HAS NO SUBSTANTIVE DUE PROCESS RIGHT TO COMPANIONSHIP WITH RESPECT TO DECEDENT.

### A.    Step One:  A Careful Description Of The Asserted Fundamental Right.

The court first must make a "'careful description' of the asserted fundamental liberty interest."  Glucksberg, 521 U.S. at 721.

"[A]ny new fundamental rights must typically 'be defined in a ***most circumscribed manner* . . .**'" Regino, 133 F.4th at 960 (emphasis added) (quoting Khachatryan, 4 F.4th at 856 ("new fundamental rights should be narrowly defined")). "[V]ague generalities" about an asserted right "will not suffice." Chavez v. Martinez, 538 U.S. 760, 775–76 (2003); see also Dawn D. v. Superior Ct. (Jerry K.), 17 Cal. 4th 932, 940–41 (1998) ("This 'careful description' is concrete and particularized, rather than abstract and general.").

Here, the FAC contends that "Mr. Love has a due-process right under the Fourteenth Amendment to companionship and society with his father [decedent Thomas]."  FAC ¶ 6 (citing Smith v. City of Fontana, 818 F.2d 1411, 1417–18 (9th Cir. 1987) ("Smith")).  Putting aside that Thomas was not plaintiff's father in any biological or legal sense, and that Smith dealt with the rights of biological children, plaintiff's broad description of the asserted right to companionship fails

- 4 -

1  the "careful description" standard.

2        When confronted with such generalities, courts often "narrowly define[]"

3  the purported right.  For example, in <u>Glucksberg</u>, a case addressing a state statute

4  forbidding assisted suicide, the Court rejected the position that the claimed right

5  was "liberty to choose how to die," and instead formulated the interest more

6  specifically as "whether the 'liberty' specially protected by the Due Process

7  Clause includes a right to commit suicide which itself includes a right to

8  assistance in doing so."  <u>Glucksberg</u>, 521 U.S. at 723.

9        In <u>Reno v. Flores</u>, a case challenging a policy of placing deportable alien

10 juveniles in custodial child care, the Supreme Court reframed the broadly asserted

11 right to "freedom from physical restraint," to the narrower "alleged right of a child

12 who has no available parent, close relative, or legal guardian, and for whom the

13 government is responsible, to be placed in the custody of a willing-and-able

14 private custodian rather than of a government-operated or government-selected

15 child-care institution." 507 U.S. 292, 301-03 (1993).

16        Similarly, in <u>Dep't of State v. Munoz</u>, a citizen sought her noncitizen

17 husband's entry into the U.S. and described her right as the "fundamental right of

18 marriage," but the Court narrowly defined the asserted right as "the right to reside

19 with her noncitizen spouse in the United States" and "to have her noncitizen

20 husband enter (and remain in) the United States."  602 U.S. at 909-10.

21        In light of these precedents, plaintiff's broad formulation of a right to

22 "companionship and society" must be rejected.  Instead, a more accurate and

23 circumscribed description of what plaintiff asserts here is:  the right of a 15-year-

24 old to the companionship of an alleged father-figure with whom he had no

25 biological or legal relationship.  With that proper framing in mind, a review of our

26 Nation's history and practices confirms that no such right exists.

27   **B.    Step Two:  The History And Tradition Of Our Nation Do Not**

28        **Establish Plaintiff's Right To Companionship With Decedent.**

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

The next step in the <u>Glucksberg</u> analysis looks to whether an asserted right is "deeply rooted in this Nation's history and tradition." <u>Glucksberg</u>, 521 U.S. at 721. As part of that analysis, "new fundamental rights must typically 'be defined . . . with central reference to specific historical practices.'" <u>Regino</u>, 133 F.4th at 960 (quoting <u>Khachatryan</u>, 4 F.4th at 856); <u>see also</u> <u>Dobbs</u>, 597 U.S. at 239 ("Historical inquiries . . . are essential whenever we are asked to recognize a new component of the "liberty" protected by the Due Process Clause because the term 'liberty' alone provides little guidance. 'Liberty' is a capacious term.").

The Supreme Court has indicated that the historical analysis encompasses more than case law and looks to sources illuminating the intent of the Framers and ratifiers of the Fourteenth Amendment. <u>See, e.g.</u>, <u>Glucksberg</u>, 521 U.S. at 711 (examining over 700 years of "Anglo-American common law tradition" in holding that the Due Process Clause does not confer a right to assisted suicide); <u>Timbs v. Indiana</u>, 586 U.S. 146, 151-52 (2019) (surveying historical practices set forth in the Magna Carta, Blackstone's Commentaries, the Virginia Bill of Rights, and the state constitutions in effect at the ratification of the Fourteenth Amendment).

Historical analysis does not support plaintiff's purported right to companionship with decedent, a person with which he had no biological or legal relationship. Rather, our Nation's history and traditions seem to touch on only parental rights and obligations flowing from biological parent-child relationships.

**1.    The Common Law Reflects Parental Rights Related To Biological Relationships.**

Some of the earliest political writing believed to have influenced our Nation's founding principles is reflected in John Locke's <u>Second Treatise of Civil Government</u>, first published in 1690. Locke's theory of natural, unalienable rights has been said to have shaped the drafting of the Bill of Rights. <u>See, e.g.</u>, <u>Am. C.L. Union of Kentucky v. McCreary Cnty., Kentucky</u>, 354 F.3d 438, 452–53 & n.7 (6th Cir. 2003) (listing accounts of Locke's influence on Jefferson's drafting of

- 6 -

the Bill of Rights)).  And the Fourteenth Amendment's Due Process Clause prohibition of state deprivations of "life, liberty, or property, without due process of law" (U.S. Const. amend. XIV, § 1) mirrors the Bill of Rights' "unalienable rights" to "Life, Liberty and Pursuit of Happiness" and incorporates such "fundamental" rights as against the states.  See generally McDonald v. City of Chicago, 561 U.S. 742, 760-66 (2010).

"Lockean Natural Rights Guarantees" "quickly became standard in state constitutions" from the founding of the Nation to the ratification of the Fourteenth Amendment in 1868.  Members of Med. Licensing Bd. of Indiana v. Planned Parenthood Great Nw., Hawai'i, Alaska, Indiana, Kentucky, Inc., 211 N.E.3d 957, 967 (Ind. 2003); see also Hodes & Nauser, MDs, P.A. v. Schmidt, 309 Kan. 610, 626 (2019) (describing that "Lockean Natural Rights Guarantees" were originally adopted into the 1776 Virginia Bill of Rights and thereafter were incorporated into nearly two-thirds of state constitutions by 1868).

Amongst Locke's "natural rights" are those arising from the parent-child relationship, which focus on rights and obligations conferred upon parents with respect to their biological or "natural" minor children.  See J. Locke, Second Treatise of Civil Government, §§ 56-58, p. 20 (J. Bennett ed. 2008), available at https://www.earlymoderntexts.com/assets/pdfs/locke1689a.pdf ("all parents . . . were obliged by the law of nature to preserve, nourish, and bring up the children they had begotten"; the "power that parents have over their children arises from their duty to take care of their offspring during the imperfect state of childhood"; "parents have a sort of rule and jurisdiction over [their children] when they come into the world").

Other historical commentators after Locke likewise demarcated rights and obligations attaching to the parent-child relationship within a biological framework.  See, e.g., 1 W. Blackstone, Commentaries, Ch. 16, p. 434-35, available at https://avalon.law.yale.edu/18th_century/blackstone_bk1ch16.asp

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1   (discussing the duties of parents to their children: "which principally con[s]ist in

2   three particulars; their maintenance, their protection, and their education," which

3   are principles of "natural law . . . laid on [parents] not only by nature herself, but

4   by their own proper act, in bringing children into the world" and "[b]y begetting

5   them"); 2 J. Kent, <u>Commentaries on American Law</u>, Ch. 29, p. 192, available at

6   <u>http://www.minnesotalegalhistoryproject.org/assets/Kent%20Comment%20Vol%</u>

7   <u>202%20(Holmes).pdf</u> (recognizing the "legal obligation of the father to maintain

8   his child" as "applicable only to relations by blood").

9        One non-biological parent-child relationship generating legally recognized

10  parental duties, noted by Kent, arises from marriage to a woman who already had

11  children.  Kent, <u>supra</u>, at 193 (if a husband "takes ***the wife's child*** into his own

12  house; he is then considered as standing in loco parentis, and is responsible for the

13  maintenance and education of the child . . .") (emphasis added).

14       Notably, these commentaries focus on parental obligations and duties, not

15  the rights of children.  See <u>id.</u> at p. 203 ("The rights of parents result from their

16  duties").  And parental rights at common law spoke not about love or

17  companionship, but rather custody and care.  See <u>Est. of Hernandez by & through</u>

18  <u>Hernandez v. City of Los Angeles</u>, 139 F.4th 790, 815 (9th Cir. 2025) (Nelson, J.,

19  concurring in part) (noting "the historical tradition that parents have authority in

20  the custody and care of their children") (citing Mary Ann Mason, <u>From Father's</u>

21  <u>Property to Children's Rights: The History of Child Custody in the United States</u>

22  at 7 (1994)); <u>see also</u> Mason, <u>supra</u>, at p. 6 ("a father's right to custody was firmly

23  established in English common law as the right to association and services of his

24  legitimate children.  Association was defined as physical custody as against all

25  parties . . . and services included not only the labor of the children . . . but their

26  wages, if they worked for another.").

27       Even when the common law referred to a child's interests, it was not

28  rights of companionship or society, but rather the right of "maintenance."  Kent,

- 8 -

1  supra, at p. 88; Blackstone, supra, at p. 271. The dearth of historical concern for

2  the rights of children seems in line with the dynamic of the parent-child

3  relationship near the founding of the Nation, which has been described as more

4  akin to a "master-servant" relationship, at best, or a "master-slave" relationship, at

5  worst. See Mason, supra, at pp. 3 & 7 (in the colonial household "the relationship

6  between father and child was more that of master and servant," but it "overlapped

7  the relationship between slave and master").

8      In all, common law beliefs regarding the parent-child relationship revolved

9  around parental rights and duties as to biological children. Essentially, by

10  choosing to birth a child and bring them into the world, parents have duties, and

11  associated rights, to take care of children and prepare them for entry into society.

12  While attitudes shifted over time to reflect increasing recognition of maternal

13  interests, recognition of common law natural, parental rights continued through

14  the ratification of the Fourteenth Amendment. See Mason, supra, at p. 50 ("By

15  the end of the [nineteenth] century, many judges were still reciting the common

16  law maxim that 'the natural right is with the father'"). Supreme Court precedent

17  over the past century has echoed these principles, as explained below.

18      **2.    Case Law Reinforces The Necessity Of Biological Or**

19          **Legally Established Relationships.**

20      The Supreme Court cautions, "the usual understanding of 'family' implies

21  biological relationships, and most decisions treating the relation between parent

22  and child have stressed this element." Smith v. Org. of Foster Fams. For Equal. &

23  Reform, 431 U.S. 816, 843 (1977) ("OFFER"); accord Santosky v. Kramer, 455

24  U.S. 745, 753 (1982) (expressing "[t]he fundamental liberty interest of ***natural***

25  ***parents***" through "blood relationships" in "the care, custody, and management of

26  their child[ren]") (emphasis added); Stanley v. Illinois, 405 U.S. 645, 651 (1972)

27  ("[t]he private interest here, that of a man in the children he has sired and raised,

28  undeniably warrants deference"); see also Lofton v. Sec'y of Dep't of Child. &

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1  Fam. Servs., 358 F.3d 804, 812 (11th Cir. 2004) ("Historically, the [Supreme]
2  Court's family and parental-rights holdings have involved biological families.").

3        As the Supreme Court explained in Lehr v. Robertson, "[t]he significance
4  of the biological connection is that it offers the natural father an opportunity that
5  no other male possesses to develop a relationship with his offspring. If he grasps
6  that opportunity and accepts some measure of responsibility for the child's future,
7  he may enjoy the blessings of the parent-child relationship and make uniquely
8  valuable contributions to the child's development."  463 U.S. 248, 262 (1983).

9        The Ninth Circuit has emphasized the requirement of a biological link for a
10 parent-child relationship to enjoy substantive due process protection.  See, e.g.,
11 Huk v. Cnty. of Santa Barbara, 650 F. App'x 365, 366–67 (9th Cir. 2016)
12 ("constitutionally-protected liberty interests in familial relationships derive from
13 the intrinsic and traditional value placed on biological connection, parental
14 instruction, and the emotional bonds that form from the intimacy of daily
15 association."); Wheeler v. City of Santa Clara, 894 F.3d 1046, 1057 (9th Cir.
16 2018) (due process protection over the parent-child relationship entails both a
17 "biological link" and "consistent involvement in a child's life").

18       The earliest Supreme Court cases identifying parental rights confined them
19 within biological or legally equivalent relationships.  See, e.g., Meyer v.
20 Nebraska, 262 U.S. 390, 399–400 (1923) (recognizing "the natural duty of the
21 parent to give his children education" in striking down Nebraska law prohibiting
22 teaching of foreign languages to students as depriving fundamental parental rights
23 "to marry, establish a home and bring up children . . . [which have been] long
24 recognized at common law as essential to the orderly pursuit of happiness by free
25 men."); Pierce v. Soc'y of Sisters, 268 U.S. 510, 534–35 (1925) (finding Oregon
26 law requiring parents to send their children to public schools unconstitutional
27 because it "unreasonably interfere[d] with the liberty of parents and guardians to
28 direct the upbringing and education of children under their control."); Prince v.

- 10 -

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    <u>Massachusetts</u>, 321 U.S. 158, 161, 167 (1944) (extending -- under the Free

2    Exercise and Equal Protection clauses, not under substantive due process --

3    parental rights of "the custody, care and nurture of the child" to an aunt who was

4    the "guardian" with "legal custody" over her niece).

5         The Supreme Court, more recently, has acknowledged non-biological

6    parent-child interests arising through marriage (see <u>Michael H. v. Gerald D.</u>, 491

7    U.S. 110, 119-20 (1989)) or adoption (see <u>OFFER</u>, 431 U.S. at 844, n.51

8    ("Adoption . . . is recognized as the legal equivalent of biological parenthood"));

9    <u>see also</u> <u>Kitaj v. Van Handel</u>, 2024 WL 4026206, at *5 (D. Ariz. Sept. 3, 2024)

10   ("there typically exists either a biological *or* legal (e.g., marriage, adoption)

11   connection with the child, in addition to the factors assessing quality"); <u>Avelar v.</u>

12   <u>Rodriguez</u>, 2018 WL 3636981, at *5 (C.D. Cal. June 13, 2018) ("Plaintiffs have

13   not alleged that Avelar is related to the children by blood, adoption, or marriage")

14   (report and recommendation adopted sub nom. <u>Avelar v. Los Angeles Cnty.</u>, 2018

15   WL 3641716 (C.D. Cal. July 30, 2018)).

16        In <u>OFFER</u>, a case involving the purported rights of foster parents, the

17   Supreme Court observed that "the importance of the familial relationship, to the

18   individuals involved and to the society, stems from the emotional attachments that

19   derive from the intimacy of daily association, and from the role it plays in

20   'promot[ing] a way of life' through the instruction of children, . . . ***as well as from***

21   ***the fact of blood relationship***."  431 U.S. at 844 (emphasis added) (citation

22   omitted).  Aside from biological relationships, the Court in <u>OFFER</u> acknowledged

23   protectable relationships developed via only marriage or adoption.  <u>Id.</u> at 843-44

24   (describing "the marriage relationship" as "[t]he basic foundation of the family in

25   our society" and equating adoption as "the legal equivalent of biological

26   parenthood").

27        In <u>Michael H.</u>, the Supreme Court held that a biological father did not have

28   a protected right to establish a relationship with his biological daughter even

- 11 -

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1  though the biological father "held Victoria out as his daughter," had a relationship

2  with the daughter, and sought to be involved in his daughter's life.  491 U.S. at

3  114–15, 124.  Finding historical practice recognized the mother's husband's rights

4  rather than the biological father's, the Court stressed "the historic respect—

5  indeed, sanctity would not be too strong a term—traditionally accorded to the

6  relationships that develop within the unitary family" as "typified . . . by the

7  marital family, but also . . . the household of unmarried parents and their

8  [biological] children.").  Id. at 124 & n.3.

9       While the Supreme Court has referred to **parental interests** "in the care,

10  custody, and control of their children" as "perhaps the oldest of the fundamental

11  liberty interests," these interests have been defined within the context of a parent's

12  rights to make decisions concerning their children.  Troxel v. Granville, 530 U.S.

13  57, 65-66 (2000); Regino, 133 F.4th at 965-66 (referring to the so-called "*Meyer-*

14  *Pierce* right" as involving parental rights to "make decisions" concerning the care,

15  custody, and control of children).

16       By contrast, the Supreme Court has "never had occasion to decide whether

17  a child has a liberty interest, symmetrical with that of her parent, in maintaining

18  her filial relationship."  See Michael H., 491 U.S. at 130 ("claim that a State must

19  recognize multiple fatherhood[s] has no support in the history or traditions of this

20  country"); Troxel, 530 U.S. at 88 (Stevens, J., dissenting) ("[T]his Court has not

21  yet had occasion to elucidate the nature of a child's liberty interests in preserving

22  established familial or family-like bonds.").

23       However, the Ninth Circuit on its own, in Smith v. City of Fontana,

24  established that children have Fourteenth Amendment rights arising from the

25  relationship with their biological parents.  See Smith, 818 F.2d at 1418 ("we see

26  no reason to accord less constitutional value to the child-parent relationship than

27  we accord to the parent-child relationship").  Since it pre-dates Glucksberg, Smith

28  has come under scrutiny.  Instead of applying the analysis required by Glucksberg,

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1    the <u>Smith</u> court simply determined that parental due process rights should

2    "logically extend[] to protect children."  <u>Compare</u> <u>id.</u> <u>with</u> <u>Est. of Hernandez</u>, 139

3    F.4th at 814 (Nelson, J., concurring in part) ("After years of stacking unreasoned

4    precedent upon unreasoned precedent, it is now blackletter law in this circuit that

5    a child has a constitutionally recognized interest in the companionship of her

6    parents.").[2]

7        There is no basis to extend Smith's flawed holding involving a biological

8    parent-child relationship to the situation here.  The authorities have consistently

9    required a biological or legal connection to find a protected parent-child

10   relationship.  As this Court correctly observed, "neither the Supreme Court nor the

11   Ninth Circuit has found that a relationship lacking a legal or biological connection

12   – like that of Plaintiff and Thomas – is sufficient to support a substantive due

13   process claim for loss of a parent-child relationship." Dkt. No. 38 at 3.  "The

14   mere novelty of such a claim is reason enough to doubt that 'substantive due

15   process' sustains it; the alleged right certainly cannot be considered 'so rooted in

16   the traditions and conscience of our people as to be ranked as fundamental.'"

17   <u>Reno</u>, 507 U.S. at 303.

18       More importantly, as detailed above, our Nation's history and traditions

19   reveal no concrete historical practices recognizing a parent-child relationship

20   _____

21   [2]  <u>Smith</u> also is an outlier amongst its sister circuits.  <u>See</u>, <u>e.g.</u>, <u>Valdivieso Ortiz v.

22   Burgos</u>, 807 F.2d 6, 8 (1st Cir. 1986) (no cognizable interest of mother, stepfather
     and siblings of adult inmate, who was allegedly beaten to death by prison guards);

23   <u>LeFever v. Ferguson</u>, 645 F. App'x 438, 447–48 (6th Cir. 2016) ("<i>Smith</i> [<i>v. City</i>

24   <i>of Fontana</i>] is at odds with our precedents); <u>Robertson v. Hecksel</u>, 420 F.3d 1254,
     1259–60 (11th Cir. 2005) (no cognizable due process interest for mother whose

25   adult son was fatally shot by a city police officer); <u>Shaw v. Stroud</u>, 13 F.3d 791,

26   805 (4th Cir. 1994) (finding no "substantive due process claim arising from the
     deprivation of the love and support of a family member," when a wife and

27   children sued a police officer who shot and killed their husband and father);

28   <u>McCurdy v. Dodd</u>, 352 F.3d 820 (3d Cir. 2003) (Due Process Clause does not
     extend to parent's interest in the companionship of adult child).

- 13 -
DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT

1  without a biological, marital, adoptive, or other legally established connection.

2  Plaintiff's FAC "concedes that Thomas was not [Love's] biological father and

3  never formally adopted him or took any prospective steps to adopt him."  Dkt. No.

4  38 at 4 (quotations omitted).  Nor is it alleged that Mr. Thomas ever married

5  plaintiff's mother or became a legal guardian of plaintiff.  And while plaintiff may

6  allege that Thomas could have qualified as plaintiff's "presumed parent" under

7  California Family Code section 7611(d), no court ever made such a determination

8  or bestowed that status on Mr. Thomas.

9      Likewise, when considering historical practices, plaintiff's assertion that

10  Due Process merely requires "Mr. Thomas's 'assumption of parental

11  responsibility' even apart from any biological or formal legal ties" (FAC ¶ 80)

12  falls apart.  There is no precedent for creating a fundamental right upon a vague

13  "assumption of parental responsibility."  Moreover, the FAC lacks any allegation

14  that decedent had authority to make the types of parental decisions typically

15  safeguarded by the Court (i.e., educational, medical, and religious decisions).

16      Because plaintiff's relationship with Mr. Thomas cannot be construed as

17  "deeply rooted in [our] history and tradition," this Court should decline to expand

18  fundamental rights here and "breathe still further substantive content into the Due

19  Process Clause."  Michael H., 491 U.S. at 122 (quoting Moore v. City of E.

20  Cleveland, Ohio, 431 U.S. 494, 544 (1977) (White, J., dissenting)).  Substantive

21  due process rights should be recognized only when they are "so rooted in the

22  traditions and conscience of our people as to be ranked as fundamental and

23  implicit in the concept of ordered liberty, such that neither liberty nor justice

24  would exist if they were sacrificed."  Glucksberg 521 U.S. at 721 (quotations

25  omitted).  Such a high threshold is simply not met here given that Mr. Love and

26  Mr. Thomas shared no biological or legal connection.

27  **C.    State Law Does Not Create Substantive Due Process Rights.**

28      In his FAC, plaintiff alleges that California state law may create a

- 14 -

1  substantive due process right (e.g., FAC ¶ 77 ("State law typically governs

2  whether a parent-child relationship exists for purposes of the Due Process

3  Clause")), and that plaintiff had a constitutionally protected relationship with Mr.

4  Thomas under California Family Code § 7611(d).

5     But this Court correctly held that "federal courts look to federal law to

6  determine whether a relationship is protected by the Fourteenth Amendment."

7  Dkt. No. 38 at 4.  The Ninth Circuit's decision in Regino squarely supports the

8  Court's ruling; explaining that *procedural* due process interests, not *substantive*

9  rights, can be "derived from state law."  See Regino, 133 F.4th at 966-67

10  (substantive due process analysis must follow Glucksberg).  In any event,

11  plaintiff's reliance on state law fails for the reasons outlined in defendants' motion

12  to dismiss (see generally Dkt. No. 34 at 11-13; Dkt. No. 36 at 7-10).

13  **V.    CONCLUSION**

14     Does Glucksberg compel this Court to reverse its prior dismissal?  No.

15  Since no biological or legal relationship existed between plaintiff and decedent,

16  there is no basis to conclude that plaintiff's purported right to companionship

17  with decedent is "deeply rooted in this Nation's history and tradition."

18  Defendants respectfully request that the Court grant their Motion to Dismiss (Dkt.

19  No. 34) in its entirety and dismiss this action with prejudice.

20  DATED:  July 28, 2025          CARPENTER, ROTHANS & DUMONT LLP

21                                      */s/ Scott J. Carpenter*

22                              By: _____

23                                   STEVEN J. ROTHANS
                                     JILL WILLIAMS
                                     SCOTT J. CARPENTER
24                                   Attorneys for Defendants

25

26

27

28

DEFENDANTS' SUPPLEMENTAL BRIEF IN SUPPORT OF THEIR MOTION
TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT